Caruthers, J.,
delivered the opinion of the Court.
This is a contest between the complainants and their father, James A. Tarpley, (who died after the filing of the bill,) as to the title to a negro slave, (Amy,) and her ten children.
The father claims the slaves as his absolute and several property; and his children insist that they are entitled, as joint owners, under the Will of their grandfather, Cader Dement. The case must be determined by the construction of the Will.
Cader Dement made his Will in 1848, and died the next year. He directs that all his property, both real and personal, be sold and divided into fourteen shares, and designates the persons by name, who are to take each. His daughter, Charlotte, who had married James A. Tarpley, was then dead, leaving the complainants as her children. About that time Tarpley married a second wife, by whom he afterwards had children, but had none by her at the date of the Will.
The clauses of the Will, upon which a construction is now to be placed, are the following:
1st. “One share to James A. Tarpley and Ms cMV dren.”
2d. “Be it understood, what each legatee has received heretofore, it is to be reduced out of their part.” *574 Ho then proceeds to specify what each had received, in dollars and cents, whether in property or money: and, in relation to this case, says:
3d. “James A. Tarpley and his wife, Charlotte, have received six hundred and fifty dollars, including one negro woman and her children, by the name of Amy, that they received at ten years old, of their 'part.'”
Now, the question is, whether, under these provisions, the title to Amy and her children rested solely in the father, James A. Tarpley, as an advancement to his .wife, or to him jointly with his children.
The rule that the intention of the testator must be collected from the Will itself, and not elsewhere, or by parol evidence, except in cases of latent ambiguity, does not forbid a reference to the state of facts under which' the Will was made; but an investigation of the surrounding circumstances, often tends to illustrate the true intention and meaning of the testator. “ To this end, it is obviously essential that the judicial expositor should place himself, as fully as possible, in the situation of the person whose language he has to interpret; and guided by the light thus thrown on the testamentary scheme, he may find himself justified in departing from the strict construction of the testator’s language: ” 1 Jar. on W., 363, and notes. Thus, facts may be proved to show the state of the testator’s property, or such facts as were known to him, that may have influenced the disposition of his property in a particular way: 2 Pick., 243, 460.
According to these rules and authorities, we may, in this case, look to the facts, that the daughter of the testator was dead; that complainants were his grand *575 children, and that the woman, Amy, and her children, had been claimed by him up to the time of making his Will; that this claim had been always admitted by his son-in-law, Tarpley, in executing his notes for nominal hire, and permitting him to pay taxes, doctors' bills, &c., for them. We may also take into consideration the speaking fact that these slaves were of three or four-times the value of the one-fourteenth part of the estate given to Tarpley and his children.
In view of these facts, it could hardly be supposed that it was the intention of the testator to give all these slaves to the son-in-law, and still make him equal with his children in the one-fourteenth. Yet, if this has been explicitly done, or if the language used will admit of no other fair construction, it must be so, as we cannot make a Will for the testator, by conjectural interpretation, upon our notions of what he ought or should have done. Our duty is to expound/ and not to create or alter. This cannot be done by parol evidence of intention or declaration.
So, the question is, what is the fair interpretation of what we find written, considered in the light of all the surrounding circumstances ?
Tarpley cannot controvert the perfect right of the testator to these slaves at the time of making his Will. He is estopped, in every form, from doing so. He gave his note for the hire the very year the Will was made, as he had done for many years before. It is not material whether the hire was nominal, or not. It was a written recognition of the right. He cannot, then, claim them as an advancement to his wife, to *576 which his marital right attached. If that ever could have been done, it was waived or surrendered.
The right of property, then, was in the testator; and the question is, was it disposed of by the Will, and if so, to whom? The language is ambiguous and inex-plicit. It is manifest, he did not intend to die intestate as to them, or anything else he owned. This the law never presumes. And the reference made to them in the third clause, shows that they were not intended to be pretermitted. But to whom did the title pass by the Will? To no one by express words, but only by implication. He saw fit to make his son-in-law equal with his grand-children, in the general legacy of one-fourteenth of his whole estate. But, as between them and his other children, there was to be deducted from that, $650, which their mother and father had previously received from him. In this sum was expressly included the slaves in question, at a valuation he arbitrarily fixed upon them. They were required to be accounted for as a part of the- $650, and not at their real value at that time. He had an unquestionable right to set any price upon them he saw proper, as the sum to be accounted for by these legatees. He could as well refer to the value of the girl, Amy, at ten years old, as to the present value of her and her increase. He could do what he pleased with his own, and no one had the power to question it.
It would seem most unreasonable and unnatural, to suppose that he intended to give to this branch of the family five or six thousand dollars worth of slaves, at $650, and that without including his grand-children in its benefits. He surely could not have intended to give all this ex- *577 elusively to the father, who was a stranger to his blood, and then let bim in to an equal participation with his grand-children in the legacy of one-fourteenth, and that, even to be reduced to the extent of the value he fixed upon the slaves. It would be a most extraordinary case, if such was his purpose. To adopt that as the scheme of the Will and the intention of the testator, would require language so clear and explicit as to admit of no other construction.
It is contended that the third clause cited, shows clearly that the slave, Amy, was an advancement, because he says they received her at ten years of age, and the law in relation to advanced property is carried' out, by fixing her value at that time, as the sum to be accounted for. The word used is not “advanced” or given, but “received.” This would apply as well to a loan as a gift. It affords no aid in arriving at the-character of the transaction. But the $650 is intended expressly to include Amy and “her children.” But the ambiguity on this point is entirely removed, by the fact that the right and title of the testator was claimed and admitted up to the time of his death. An advancement passes the right. This, then, was not an advancement, as the title was retained.
But, it is recited in the Will that the $650, for which they are to account Amy “and her children,” not the woman alone. As, then, the amount for which he saw proper to make this share account, was to operate as a reduction of the joint bequest to the father and children, the slaves which it expressly included, must have been intended to pass to the same persons. We' think the Will is susceptible of no other sensible con *578 struction. This comports with the natural feelings of the testator, and the opposite construction would be in palpable conflict with them. The conclusion to which we are brought, therefore, is, that the title to these slaves was vested, by implication, in the father and his children, as did the one-fourteenth, minus the $650. This being so, the father could not resist their right, even if the slaves had belonged to him, as he has received under the Will, his part of the fourteenth. And this, upon the rule that one cannot take a benefit under a Will, and set up any claim against it. Having elected to claim under it, he cannot claim against it. But the application of’ this principle would, of course, depend upon the conclusion that the slaves were disposed of in the Will; and that, we have seen, is the proper exposition. Yet there is no necessity to resort to that rule, as Tarpley had no title at the death of the testator, and consequently, nothing of his is bequeathed, to raise the question of election to claim under or against the Will.
As to the plea of the Statute of limitations, it is only necessary to say, that, as Tarpley was a tenant in common, or joint owner with his children, (and for most of whom he was guardian,) his holding must be regarded to have been under the joint title. The facts proved do not make out a case of adverse holding under such circumstances as to avoid this presumption, and give him the benefit of the Statute of limitations. To make this defense available, he must show clearly-that he held solely for .himself, adversely to the rights of complainants, and that they had knowledge of such claim and holding. This is not made out by him. In *579 deed, the proof seems not to have been directed to that defense; but the contest was waged upon the construction of the Will, and the supposed advancement.
On this branch of the case, the Court properly decreed that Amy and her children, as well as the one-fourteenth of Cader Dement’s estate, should be equally divided between the complainants and their father, be accounting for those he had sold.
The other branch of the case presents less difficulty. At the sale of the lands of Cader Dement, as directed by the Will, Tarpley became the purchaser of 157 acres, for which he executed, his notes. After this, he was appointed guardian for six of complainants, and took up his notes for the land from the executors, simply by executing his receipt, as guardian, for the amount due to his wards, and himself, perhaps, under the Will,as to the fourteenth of the estate. In effect, this was a purchase of the land with the money of his wards. He was not their guardian at the time, of his purchase; but was at 'the time of payment, and as guardian, vested their funds in the land.- What difference can it make, in principle, whether this was done at, or after the contract of purchase? It was, in the one case, as well as the other, the conversion of the trust fund into land. It is every where laid down, that in such a case, the owners of the fund may elect to take the land instead of the money, whenever the fact comes to their knowledge. It is riot too late to ' do this, after they have received the fund, if they were not aware-of the investment at the time. To preclude them on this ground, it -must appear that they knew their rights,- *580 and made their election accordingly, or that they have delayed too long to assert them,
Their right to the land is not a resulting trust, properly so called, as stated in the decree. That is well established by the authorities cited in the argument. But, it is an equitable right of the owners of a trust fund, to pursue it into any property in which the trustee may have invested it; 2 Kent, 229, and notes. The case of Turner vs. Pettigrew et als., 6 Hum., is conclusive, without reference to other authorities. There is no distinction, in principle, between that case and this. It is, however, not clear from the proof, that the whole consideration for the land was paid out of the trust fund. If that were not so, the decree is wrong, in vesting the title to the whole of the land in the wards. They would only be entitled to an interest, to the extent, that their funds were applied, to the payment of the consideration. This must be referred to the Master, to ascertain, and report.
In all other respects, we think the decree is right, and it will be affirmed..
The cause will be remanded for the account ordered, the sale of the land, and such further orders and decrees, as the rights of the parties may require.
The costs of this Court will be paid out of the common fund.
Since writing the above opinion, the. counsel of defendants have directed our attention to the question-made in the argument, as to the right of the widow of James A. Tarpley, to dower in the tract of 157 acres of land in controversy. There is nothing in the pleadings to bring up that question; but as the *581 case is remanded, it may be presented by the proper amendment, or a distinct application on the part of the widow. We think it very clear, that she has no right to dower, out of the interest of the complainants, who were the wards of her husband; for as to that, he never was seized as owner, but only as trustee for them. So far as he paid for the land out of other means, the trust does not attach, and to that extent, she would have a right to dower, and no further. Her husband died testate, and she did not dissent from his Will. But, that provides, that she shall have legal dower, and gives her the same interest as in case of intestacy or dissent.
But, the question, as to any right to dower, as against the deed of trust to McCulloch, will be left open for the Chancellor, after taking the account ordered.